IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Michael M. Kioko, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:22-cv-00763-HFS |
| University Health f/k/a/ Truman Medical Center, | ) |
| Defendant. | ) |

**ORDER**

Michael Kioko filed suit against his former employer University Health f/k/a/ Truman Medical Center (University Health) under Title VII of the Civil Rights Act alleging unlawful discrimination, hostile work environment, and retaliation. (Doc. 3). University Health has filed a motion for summary judgment on all claims, arguing that the undisputed facts show that plaintiff cannot establish a prima facie case of discrimination, hostile work environment, or retaliation. (Doc. 33).

**Summary Judgment Standard.**

Summary judgment is appropriate if the moving party demonstrates there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of informing the court of the basis for its motion. Solis v. Contingent Care, LLC, 2013 WL 12205693, at *1 (W.D. Mo.) (citing Celotex Corp. v. Catrett, 467 U.S. 317, 323 (1986)). To avoid summary judgment, the nonmoving party must set forth specific facts showing a genuine issue for trial. Id. (citing Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997)). In deciding

1

x

whether to grant summary judgment, the Court must view all facts in a light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences drawn from the facts. Robinson v. Monaghan, 864 F.2d 622, 624 (8th Cir. 1989).

At the summary judgment stage, the movant must support its motion either by citing to the record or by showing that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325; Fed R. Civ P. 56 (c). In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue for trial exists. Fed. R. Civ. P. 56 (c). In so doing, the nonmoving party cannot create sham issues of fact to defeat summary judgment. RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995). Unsupported, self-serving allegations and denials are insufficient" for meeting this burden. Wilson v. Miller, 821 F.3d 963, 970 (8th Cir. 2016) (at the summary judgment stage, "[a] plaintiff may not simply cite unsupported self-serving allegations, but must substantiate [their] allegations with sufficient probative evidence.")

**Background Facts.**

Both parties have provided their own version of facts. (Docs. 34, 46, 50). Although the parties agree to most facts set forth by the other, there are several disputes of fact. Many of the "disputes" are either immaterial or not necessary to resolve for the purpose of this order. With these limitations in mind and for ease of

2

Case 4:22-cv-00763-HFS    Document 51    Filed 03/12/25    Page 2 of 19

reference, the general background facts are set forth below, disputed facts will be discussed as necessary. As this is a motion for summary judgment, all facts will be viewed in the light most favorable to Kioko.

**Kioko's Employment with Truman Medical Center.**

Michael Kioko is a 57-year-old black man, originally from Kenya, Africa. (Doc. 46 ¶ 2). Kioko was employed by University Health as a Point of Care Coordinator (POC) from October 2016 to June 11, 2021. (Doc. 46 ¶ 3). His responsibilities included coordinating diagnostic testing for patient care at University Health's medical facilities, such as assuring that the necessary diagnostic equipment is available at each medical facility and that the equipment was properly calibrated and in working order. (Doc. 46 ¶ 4).

**Problems with Brian Rorabaugh.**

As a Point of Care Coordinator, Kioko interacted with the Information Technology Department (IT) for various reasons, such as troubleshooting equipment malfunctions and obtaining IP addresses for devices to activate and connect to the computer network. (Doc. 46 ¶¶ 4,5). Central to this case, are the interactions between Kioko and Brian Rorabaugh. Rorabaugh was an employee of Cerner Corporation and an IT Specialist. (Doc. 46 ¶ 6). Kioko would turn to Rorabaugh to resolve problems with diagnostic devices. (Doc. 46 ¶ 6)

Kioko has alleged that "Rorabaugh would repeatedly in a mockingly manner pretend that he did not understand Kioko's speech requiring him to constantly repeat himself and . . . waste an unnecessary amount of time." (Doc. 46 ¶ 7). He

3

elaborated: Rorabaugh interacted with him "in a demeaning and disrespectful manner by speaking in a hostile tone of voice, with an angry expression on his face, often using profanity, and insulting Kioko in front of others . . . ". (Doc. 46 ¶ 9).

**Personnel Changes at University Health.**

Beginning in late 2020, several personnel changes impacted University Health's POCs. In January 2021, following the resignation of the former POC Supervisor, the POCs began to report to Lori Hall, Director of Lab Operations-Lakewood. Ms. Hall, in turn, reported to Nan West, Medical Lab Program Director. (Doc. 34 ¶ 7). In early 2021, University Health was also actively recruiting for two additional POCs to replace the former POC Supervisor and Ms. Hall, who had been promoted to Director of Lab Operations from the POC position. (Id.) University Health does not dispute that Kioko had a heavy workload at that time due to these vacancies.

On January 27, 2021, Kioko called Todd Engle in the University Health Humans Resources Department to let him know that he was overwhelmed by his workload. (Doc. 34 ¶ 8). During the phone call, Kioko also discussed an interaction with Rorabaugh where Rorabaugh told Kioko that he did not know "what the F*** he was doing." (Doc. 34 ¶ 9). Engle advised Kioko to stop contacting Rorabaugh directly and to submit any request for IT assistance to his supervisor, who would then in turn obtain the information and provide it to him. (Doc. 34 ¶ 10). Engle states that Kioko did not mention that he believed his workload or Rorabaugh's

comment was based on his race or national origin, but that Kioko's complaint was focused on Rorabaugh's use of profanity. (Doc. 34 ¶11). Following the January 27 phone call, Engle spoke with Nan West to relay Kioko's concerns about his workload. (34 ¶ 13). West spoke with Kioko to assure him they would soon be hiring two new POC's which would reduce his workload. (34 ¶ 13).

On February 2, 2021, Kioko followed up with Engle by email. In the email he references the "incident with profanity" occurring in March of 2020 involving Rorabaugh. (Doc. 46 ¶ 11) (Doc. 46-2). Kioko wrote: "Brian admitted to John about using the F word and said he was frustrated with me because he could not understand what I was saying because of my accent (I am Kenyan by origin). There has been a history of inappropriate language and email demeanor between me and Brian and John was aware of it." (Doc. 46-2). Engle understood Kioko's complaint to be based on Rorabaugh's use of profanity and University Health has no record of ever receiving any complaint that Rorabaugh engaged in inappropriate behavior based on race or national origin. (Doc. 34 ¶ ¶ 11, 12).

In May of 2021, plaintiff asked to meet with Hall to discuss his work assignments. (Doc. 34¶ 17). According to Hall, plaintiff neither suggested that he was being treated differently based on his race or national origin nor did he complain about Rorabaugh. (Doc. 34 ¶ 17). A May 13, 2021, email from Hall to Kioko summarized the responsibilities of the three POC's and Kioko's concerns about his workload. (Doc. 34-3). Handwritten notes on the email indicate that Kioko believed he had over fifty percent of the POC workload. (Doc. 34-3). The email summarized job responsibilities, workload, and "other concerns." (Doc 34-

5

3). There was no mention of Rorabaugh or any allegation of discriminatory treatment. (Doc. 34-3). Hall and Kioko met again on May 21 to discuss Kioko's workload. Hall sent another email to Kioko on May 24, 2021, summarizing their meeting, thanking Kioko for talking through his concerns about his workload, and acknowledging that Kioko "indicated that the workload is manageable and equitable between the 3 coordinators." (Doc. 34-4). Kioko does not dispute West's statements in the May 21 email but responds in his own statement of facts that he told Hall that the workload was "unmanageable and inequitable." (Doc. 46 ¶22). The follow up May 21 email from Hall to Kioko does not mention Rorabaugh. (Doc. 34-4).

**Resignation.**

On May 27, 2021, plaintiff submitted his written resignation stating: "Due to circumstances beyond my control, I have made the decision to terminate my employment at Truman Medical Center effective June 11, 2021. I feel honored to have been part of the dedicated TMC workforce taking care of the patients we serve during my tenure with the Corporation." (Doc. 34-1 p.6). Plaintiff worked for the two weeks following his resignation letter, and his employment ended on June 11, 2021. (Doc. 34-1 ¶15). He then filed this action bringing claims of discrimination based on race and national origin, hostile work environment, and retaliation.

**Legal Standards.**

In discrimination cases, a plaintiff can establish a claim by presenting direct or circumstantial evidence of discrimination. Lake v. Yellow Transp., Inc., 596 F.3d 871, 873 (8th Cir. 2010). Here, Plaintiff presents no direct evidence of discrimination and relies on circumstantial evidence. In such cases, the Court applies the *McDonnell-Douglas* burden-shifting framework summarized as follows:

> Under *McDonnell Douglas*, the plaintiff initially has the burden to establish a prima facie case of discrimination. A prima facie case creates a rebuttable presumption of discrimination. The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination. Lake, 596 F.3d at 873-74 (internal citations and quotations omitted).

"Under the McDonnell Douglas framework, the plaintiff bears the burden of establishing a prima facie case of discrimination." Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008). To meet [his] burden, a plaintiff must show the following: (1) that []he is a member of a protected class; (2) that []he was meeting [his] employer's legitimate job expectations; (3) that []he suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently. Id. The analysis for retaliation is similar. And plaintiff must also show that the that the adverse action was causally linked to the protected conduct. Jackman v. Fifth Jud. Dist. Dept of Corr Servs., 728 F.3d 800, 804 (8th

Cir. 2007). "Further, retaliation must be the 'but for' cause of the adverse employment action." Id.

If Plaintiff meets his burden of establishing a prima facie case, the burden then shifts to University Health to "present evidence of a legitimate, nondiscriminatory reason for its adverse employment action." Bearden v. Int'l Paper Co., 529 F.3d 828, 832 (8th Cir. 2008). This is "a burden of production, not persuasion" and "can involve no credibility assessment." Murguia v. Childers, 81 F.4th 770, 776 (8th Cir. 2023) (internal quotations omitted). "If the employer can articulate a nondiscriminatory reason, the burden returns to the employee to prove that the proffered reason is pretextual." Bearden, 529 F.3d at 831-32. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Torgenson v. City of Rochester, 643 F.3d 1031, 1046-47 (8th Cir. 2010) (Although the burden of proving a prima facie case is not onerous, the plaintiff must satisfy every element of his prima facie case, carrying at all times the ultimate burden of proof and persuasion that the employer discriminated against him on an impermissible basis.).

**Discrimination Based on National Origin and Retaliation.**

University Health first contends that it is entitled to summary judgment on plaintiff's claim of discrimination and retaliation based on race and national origin.[1] Kioko responds that University Health discriminated and retaliated against him

---

[1] Although there are references to discrimination based on race, Kioko uses these terms interchangeably, but his allegations are focused on discrimination based on national origin.

based on national origin by allocating a disproportionate amount of work to Kioko as compared to his white Non-African POC peers. (Doc. 46, p. 4). Plaintiff's claims for discrimination and retaliation both follow the McDonnell Douglas burden shifting analysis. Fields v Shelter Mut. Ins. Co. 520 F.3d 859, 864 (8th Cir. 2008).

**Prima Facie Case.**

University Health concedes that plaintiff is a member of a protected class and was meeting minimum expectations of employment. University Health states that plaintiff has failed to establish that he suffered an adverse employment action and that similarly situated employees outside the protected class were treated differently. University Health states that Kioko has not shown a prima facie case or discrimination or retaliation.

**Adverse Employment Action.**

University Health argues that plaintiff cannot establish an adverse employment action, citing Jackman v. Fifth Judicial Dist. Dep't of Correctional Services, 728 F.3d 800, 804 (8th Cir. 2013) ("An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge.")

At the outset, the Court notes that the Supreme Court recently relaxed the standard for showing an adverse employment action in employment discrimination cases brought under Title VII in Muldrow v. City of St. Louis, 144 S.Ct. 967 (2024). The Court in Muldrow obviated the requirement that the adverse employment

9

Case 4:22-cv-00763-HFS     Document 51     Filed 03/12/25     Page 9 of 19

action be significant, material or serious, and redefined an adverse employment action as a "disadvantageous change to the compensation, terms, conditions, or privileges of employment." Cole v. Group Health Plan, 105 F.4th 1110, 1114 (8th Cir. 2024) (quoting Muldrow v. St. Louis, 601 U.S. 346 (2024)). Plaintiff is now only required to show "some harm respecting an identifiable term or condition of employment." Cole, 105 F.4th at 1114.

Neither party recognized this reduced standard and briefed the adverse employment action issue under the material standard described in Jackman. (Doc. 34, p. 3-5, Doc. 46, p.4-5). See Collins v. Union Pac. Railroad Co., 108 F.4th 1049, 1053 (8th Cir. 2024) (remanding to district court claims of retaliation and discrimination for consideration under standard announced in Muldrow). For the purpose of this order, this Court may assume, without deciding, that a disproportionate workload might qualify as an adverse employment action as a disadvantageous change to the conditions of employment.

**Disproportionate Workload.**

However, even under the Muldrow standard, Kioko has failed to create a genuine issue of fact that the workload was disproportionate. Plaintiff states that University Health allocated a "grossly disproportionate" amount of work to him as compared to his white POC peers: Lindsey Hall and Heidi Schultz. (Doc. 46, p 4). He states that Hall allocated more than fifty percent of the workload to Kioko alone and less than 50 percent to the other two POC's together. Moreover, he states that he had to perform this "grossly disproportionate amount of workload

10

without direct access assistance from the IT Department which made performing the work even more burdensome and difficult." (Doc. 46, p. 5).

University Health, however, has provided an affidavit that it hired two additional POC's to alleviate the burden on Kioko and that Kioko agreed that the workload was fair and equitable. (Docs. 34-1 ¶ 10, 34-4). For support, University Health attaches a May 24, 2021, email from West to Kioko summarizing their May 20, 2021, meeting to discuss concerns about his workload. (Doc. 34-4). The email detailed Kioko's concerns and concluded by West stating: "You indicated the workload is manageable and equitable between the 3 coordinators and you were dedicated to staying at Truman in your role and as such would improve on meeting timelines." (Doc. 34-4). Kioko's only response to the West email is his statement in his brief that he advised West that the workload was inequitable and unmanageable. (Doc. 46, p.9).

Kioko's evidence of disproportionate workload falls short. The evidence of workload is only supported by his own affidavit and opinion that he had over fifty percent of the workload. Coleman-Wilson v. General Dynamic Info. Tech. Inc., No. 4-22-cv-00504-HFS (Feb. 2, 2024) (self-serving opinions lack evidentiary clout). There is no comparative evidence presented of the workload of the other two POC's or explanation to refute Hall's statement in the email that Kioko agreed that the workload was manageable and equitable.[2] The evidence relied on by Kioko is not sufficient to create a genuine issue of fact as to workload assignment. See

---

[2] Ashley Harrison an attorney representing University Health also submitted an affidavit that plaintiff has not submitted any written discovery or taken any depositions. (Doc. 34-5).

11

Haas v. Kelly Services, Inc., 409 F.3d 1030, 1034 (8th Cir. 2005) (Plaintiff may not merely point to unsupported self-serving allegations but must substantiate allegation with probative evidence that would permit a finding in her favor.).

**Constructive Discharge.**

Kioko also argues that an adverse employment action can be shown as a result of constructive discharge. He does not dispute that he resigned from his position at University Health. However, he argues that his resignation was based on a hostile work environment and amounted to constructive discharge.

Kioko states that being "required to perform more than 50% of the workload allocated between the three POC's without direct access assistance from the IT Department" created conditions that were so intolerable that a reasonable person in Kioko's position would be compelled to resign to protect his health. (Doc. 46 p. 15).

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996). "A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable." Id. "This burden is substantial as the bar is quite high in constructive discharge cases." O'Brien v. Dep't of Agriculture, 532 F.3d 805, 810-11 (8th Cir. 2008) (internal quotations, citations, and punctuation omitted).

The claim that the disproportionate workload constituted intolerable working conditions suffers from the same problems discussed above. Not only has Kioko

failed to present any facts to dispute the evidence offered by University Health as to his workload he also failed to explain his resignation letter and continued work following his notice of resignation. Thus, there is no genuine issue of fact as to intolerable working conditions, and plaintiff has not met the substantial burden of showing constructive discharge.

**University Health's Reasons for Changes to Kioko's Employment.**

Even assuming Kioko met his burden of showing a prima facie case of discrimination or retaliation, University Health has offered a legitimate nondiscriminatory reason for the asserted adverse action. Furnco Const. Co. v. Waters, 438 U.S. 567, 578 (1978). University Health explains that the change in workload assignment was a temporary result of department restructuring. The increased in workload was the result in job changes and the need for two additional POC's. It is further undisputed that University Health recognized and ultimately hired two additional POC's. Thus, University Health has shown a legitimate, non-discriminatory reason for the increased workload.

**Pretext and Discriminatory Animus.**

Pretext is established "either by directly persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 US at 256. Generally, a plaintiff may show an inference of discrimination and pretext by showing that an employer (1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision. Lake, 596 F.3d 874 (8th Cir. 2010).

Kioko argues that University Health treated him differently than the similarly situated employees (the two other POC's) evidenced by the workload disparity and that the other two POC's could call Rorabaugh, and he could not.  This argument suffers from the same problems as referenced above, as the allegations are without evidentiary support.   Furthermore, even if Kioko could somehow show a genuine issue as to pretext, there is still no factual allegations to support a finding of discriminatory animus.

The Eighth Circuit's decision in <u>Guimares v Supervalu, Inc</u>., is instructive. 674 F.3d 962 (8th Cir. 2012). In that case, just like here, the Court considered whether a supervisor's pretending not to understand an employee with an accent, constantly asking the employee to repeat herself, and requiring the employee to repeat directions, raised an inference of discriminatory animus based on national origin. Id. at 974-75.  Although the Eighth Circuit recognized that ridiculing a person based on their accent may in certain situations be relevant to discriminatory animus, the allegations in <u>Guimares</u> were not sufficient to raise an inference of national origin discrimination. Id.   Similar to that case, there is no evidence here that Rorabaugh ever referenced Kioko's accent and Kioko's primary complaint was Rorabaugh's profanity and ridicule based on failing to understand him.  This is not sufficient evidence to support a finding that a prohibited reason more likely motivated the employer.  Id.  Kioko has not shown a genuine issue as to discriminatory animus.  <u>Burlington N. & Sante F. Ry. Co. v. White,</u> 548 U.S. 53, 68 (2006) (Title VII does not set forth a general civility code for the American workplace).

For these reasons, University Heath is entitled to summary judgment on Kioko's claims based on race and national origin discrimination and retaliation.

**Discrimination Based on Hostile Work Environment.**

"To establish a prima facie case for hostile work environment, a plaintiff must show: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper action. <u>Warmington v. Bd. Of Regents of Univ. of Minnesota</u>, 998 F.3d 789, 799 (8th Cir. 2021).

University Health states that it is entitled to summary judgment on this claim because: (1) plaintiff was not subject to unwelcome harassment; (2) there is no causal connection between the harassment and plaintiff's race or national origin; (3) plaintiff experienced no change in terms conditional or privileges of his employment because of any University Health action; (4) plaintiff made no showing that University Health knew or should have known of any harassment and failed to take action.

Plaintiff's allegations of unwelcome harassment again center on his interactions with Rorabaugh. Plaintiff alleges that at Rorabaugh would repeatedly mock his speech, pretend he could not understand him, interact with him in a demeaning and disrespectful manner, and use profanity. (Doc. 46 ¶7). On one occasion, Kioko contacted Rorabaugh to obtain an IP address and Rorabaugh said "if you don't know your f**** job why are you here?" Kioko said he observed

Rorabaugh dealing with white POC's in a cordial and respectful manner. (Doc. 46 ¶10). Kioko states that he notified John Sparkman, former Lakewood Lab Director, who had supervisory authority over Rohrabaugh about his problems with Rorabaugh, and University Health failed to take disciplinary or corrective action.

To prevail in a hostile work environment claim, the employee must also show that the alleged harassment affected a term, condition, or privilege of employment – the plaintiff must meet a "high threshold." Liles v CS McCrossan Inc., 851 F.3d 810, 823 (8th Cir. 2017). To demonstrate this element, plaintiff must show the workplace environment was "both subjectively and objectively offensive," in that the conduct at issue was "extreme in nature and not merely rude or unpleasant." Id. (citing Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009)). "When a plaintiff attempts to establish a hostile work environment based on the actions of co-workers, he . . . must then present evidence that the employer knew or should have known about the harassment and failed to respond in a prompt and effective manner." Anderson v. Durham D&M, LLC, 606 F.3d 516, 519 (8th Cir. 2010) (citation and quotation marks omitted).

For the purpose of this order, the Court assumes, without deciding, that Kioko has demonstrated that Rorabaugh's treatment of him was subjectively offensive. Blomker v. Jewell, 831 F.3d 1051, 1056 (8th Cir. 2016) (subjective component requires that the "victim must subjectively believe her working conditions have been altered").

The objective component of a hostile work environment claim, however, requires that the alleged harassment to be "severe or pervasive enough to create

an objectively hostile or abusive work environment . . . ." Id. (citing Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787, 801 (8th Cir. 2009)). The totality of the circumstances is relevant to a hostile work environment claim, "including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." Id. (quoting Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420 (8th Cir. 2010)).

Although the Court in no way condones Rorabaugh's behavior, the summary judgment record, viewed in the light most favorable to Kioko, does not support a finding of a conduct rising to the substantial level required to sustain a hostile work environment claim in the Eighth Circuit. See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004) (holding "[a] hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents"; racially offensive remarks approximately once a month for two years by company's owners did not create a hostile work environment under the law).

Although Kioko certainly interpreted Rorabaugh's treatment of him to be based on his national origin, Rorabaugh's comments also seem to be more directed as an attack on Kioko's job performance and Rorabaugh's own shortcomings in understanding Kioko. See Guimares, 674 F.3d at 974-75. Moreover, it is undisputed that Kioko's email complaining of Rorabaugh's treatment of him only complained about Rorabaugh's profanity, not discriminatory

17

treatment. Indeed, Kioko specifically stated in his email to Sparkman: "No TMC employee should have their assignment routed to others for fear of being insulted at work. If this was brought to Brian's attention and a corrective action taken – then that is fine – in the event he didn't or doesn't know profanity is prohibited while conducting TMC related business." (Doc. 46-2). Moreover, although Kioko describes his interactions with Rorabaugh as pervasive, he alleges only four specific encounters with Rorabaugh and only one specific instance where he notified University Health and that incident involved Rorabaugh telling him he did not know what he was doing. (Doc. 3, Am Comp. ¶ 13-15, 17). See Blomker, 831 F.3d at 1058 (affirming dismissal of hostile environment claim where conduct alleged was vile or inappropriate but not actionable).

Furthermore, it is undisputed that once Kioko notified Sparkman of his problems with Rorabaugh, University Health took corrective action to minimize interaction between the two. Anderson, 606 F.3d at 519 (insufficient evidence that management was aware of racial nature of the harassment). Although Kioko may not have liked the corrective action taken, it is undisputed that University Health stepped in to minimize the interactions between the two. The Rorabaugh personality problem, however characterized, was not, moreover, the claimed cause of Kioko's 'forced' resignation. Nor was the work-burden claim asserted in more than a conclusory way, or arguably on this record related to national origin discrimination.

Accordingly, for these reasons, University Health is entitled to summary judgment on the hostile work environment claim.

18

Case 4:22-cv-00763-HFS    Document 51    Filed 03/12/25    Page 18 of 19

For these reasons, Defendant's motion for summary judgment on plaintiff's claims of discrimination, retaliation, and hostile work environment is hereby GRANTED. (Doc. 33). The claims against University Health are DISMISSED.

                                                                              */s/ Howard F. Sachs*
                                                            HOWARD F. SACHS
                                                           UNITED STATES DISTRICT JUDGE

Dated: March 12, 2025
Kansas City, Missouri